# United States Court of Appeals
## For the First Circuit

No. 09-2109

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ A. VÁZQUEZ-CASTRO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen C. Cerezo, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Siler,* Circuit Judges.

Alvin E. Entin, with whom Richard Della Fera was on brief for appellant.
Vernon B. Miles, with whom Rosa Emilia Rodriguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, and Luke Cass, Assistant United States Attorney, were on brief for appellee.

April 7, 2011

---

*Of the Sixth Circuit, sitting by designation.

**SILER**, <u>Circuit Judge</u>.  Jose Vazquez-Castro was convicted by a jury of three counts:  (1) conspiracy to possess with intent to distribute cocaine; (2) possessing cocaine with intent to distribute; and (3) possessing a firearm in furtherance of drug trafficking.  He appeals the sufficiency of the evidence for the weapon charge in Count Three, and argues the district court erred by instructing the jury on the <u>Pinkerton</u> theory of liability.  For the following reasons, we **AFFIRM.**

**I.**

**A.    The Undercover Sting Operation**

DEA Agents Miguel Melendez-Cruz, Roberto Cruz-Perez, and Johnny Melendez organized an undercover operation to buy cocaine. The targeted individuals included Carlos Rodriguez and Israel Ruiz. Rodriguez had solicited Marcos Nunez-Retamar to be a "runner," or an intermediary who earns commissions by matching suppliers of cocaine with buyers.  Nunez-Retamar became a confidential informant.

Agent Cruz-Perez instructed Nunez-Retamar to call Rodriguez and tell him that Cruz-Perez was his brother and he wanted to buy ten kilograms of cocaine.  Cruz-Perez, Melendez, and Nunez-Retamar then met with Rodriguez and Ruiz.  Nunez-Retamar introduced Cruz-Perez as his brother, and told Rodriguez and Ruiz that he wanted to buy ten kilograms of cocaine.  After conversing about the specifics of the deal, they came to an agreement to purchase the cocaine.

-2-

The next day, Rodriguez called to report that he had spoken with the supplier and "they wanted to do the deal" in front of a restaurant at a shopping mall that evening. Rodriguez and Ruiz arrived at the designated time, but stated that their supplier did not like the area because they saw suspicious vehicles and uniformed patrols.

Cruz-Perez made several recorded calls to Rodriguez and Ruiz the following day. Ruiz said that no one wants to "release the tickets," which meant that the suppliers did not want to provide the drugs without first seeing the money. Cruz-Perez asked Rodriguez if he had "iron," meaning firearms. Rodriguez replied, "I carry steel on my waist."

Cruz-Perez, Melendez, Nunez-Retamar, and Rodriguez agreed to meet at a restaurant for the exchange at 5:30 p.m. on June 23, 2006. Cruz-Perez placed agents around the premises to make arrests once the drugs arrived. They planned to call these agents after seeing the drugs and ask them to "bring the money in," which was the code phrase ordering the arrests of the dealers.

Cruz-Perez, Melendez, and Nunez-Retamar arrived first, and waited inside the restaurant. Rodriguez called and said he could not attend the meeting because his car broke down. At 6:30 p.m., a Mitsubishi automobile parked in front of the restaurant, with Ruiz in the back seat and Angel Cruz-Perez ("Angel") driving. Vazquez-Castro was also in the vehicle, sitting in the front

passenger seat.  Ruiz exited the vehicle, and Angel and Vazquez-Castro left the area.  Ruiz entered the restaurant, told Cruz-Perez that the "kilos were there," and asked about the money.  The agent replied that "not a penny was going to be shown until" he "saw the kilos."  Ruiz responded that he needed to speak "with the owners of the material."

Ruiz left the restaurant, made a telephone call outside, and returned to again inquire about the money.  The agents repeated that there would be no money until the drugs were shown, and Ruiz left to make another telephone call.  The Mitsubishi returned with Angel driving and Vazquez-Castro in the front passenger seat. Ruiz got into the back seat.  Cruz-Perez approached the Mitsubishi, opened the rear passenger side door, and asked whether they were "going to negotiate?"  Angel said "yes," and instructed Vazquez-Castro to "go get that."

Vazquez-Castro exited the vehicle, walked to an Isuzu "about six vehicles away," and got into the rear passenger side.  A few minutes later, Vazquez-Castro exited the vehicle, and returned with his hand tucked near the left side of his body and apparently carrying something inside his sweater.  Vazquez-Castro got back into the Mitsubishi.  Ruiz opened the door and said, it is "here." Cruz-Perez instructed Nunez-Retamar to check the drugs.  Nunez-Retamar looked in the passenger's side "for several seconds," then told Cruz-Perez to "[b]ring the money, there is a kilo."

Angel and Vazquez-Castro exited the vehicle and walked into the restaurant, where they were arrested. Ruiz was arrested outside, as were the two individuals in the Isuzu. When Melendez arrested the driver of the Isuzu, the driver said he was armed and "[t]he weapon is under the carpet in the driver's seat, on the floor." The agent then found a loaded .45 caliber pistol folded in the floor mat on the driver's side of the Isuzu. The agents also retrieved a blue bag containing five kilograms of cocaine from the back seat of the Isuzu and a kilogram of cocaine from the Mitsubishi's glove box.

## B. The Trial

Vazquez-Castro and his co-defendants were indicted on three counts. Count One charged Vazquez-Castro and others with knowingly and unlawfully conspiring to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Count Two charged him with possessing with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2. Count Three charged, "[t]he defendants herein, while aiding and abetting each other, did possess, use and carry . . . a .45 caliber Ruger pistol . . . in furtherance of a drug trafficking crime" in violation of 18 U.S.C. §§ 924(c)(1)(A) and (c)(1)(A)(i).

At trial, Vazquez-Castro moved under Rule 29(a) for a judgment of acquittal on Count Three. The district court denied the motion. It held that, even though the Government had expressly charged Vazquez-Castro under an aiding and abetting theory in Count Three, the jury may be instructed to consider the liability theory from Pinkerton v. United States, 328 U.S. 640 (1946), as an alternative theory for conviction under 18 U.S.C. § 924(c)(1). The district court found that "since both parties argued the foreseeability factor [of the Pinkerton theory] during the Rule 29(a) discussion, a factor which is not an element of the standard of proof of the aiding and abetting theory, . . . the alternative Pinkerton theory of liability is justified." The court later instructed the jury on both theories of liability.

Vazquez-Castro was convicted and sentenced to 120 months for Counts One and Two to be served concurrently, and 60 months for Count Three to be served consecutively, for a total of 180 months imprisonment.

## II.

On appeal, Vazquez-Castro makes three related arguments. He argues there was insufficient evidence to convict him of the weapon charge, and maintains that the district court therefore erred in denying his Rule 29 motion before the case was submitted to the jury. He also contends that, because the government expressly included an aiding and abetting theory of liability in the

-6-

indictment, the court erred by instructing the jury on the Pinkerton theory of liability.[1]

We review the denial of a Rule 29 motion for acquittal de novo.  See United States v. Rosado-Perez, 605 F.3d 48, 52 (1st Cir. 2010).  We review the jury instructions for plain error because Vazquez-Castro did not object to them at trial.  See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 732 (1993).  In analyzing Vazquez-Castro's sufficiency claim, "we must affirm the conviction if after de novo review of the evidence taken in the light most favorable to the government, we conclude that a rational factfinder could find that the government proved the essential elements of its case beyond a reasonable doubt."  United States v. Marin, 523 F.3d 24, 27 (1st Cir. 2008).

## A.    The Pinkerton Instruction

An aiding and abetting theory of liability requires a higher mens rea than a Pinkerton theory of liability.  United States v. Shea, 150 F.3d 44, 50 (1st Cir. 1998), abrogated on other grounds, United States v. Mojica-Baez, 229 F.3d 292 (1st Cir. 2000).  To show aider and abettor liability, the government must prove that the defendant knew to a "practical certainty" that the principal would use a weapon during the commission of the crime.  United States v. Spinney, 65 F.3d 231, 238 (1st Cir. 1995).  "[P]ractical

---

[1]    We have also reviewed the pro se supplemental brief submitted by Vazquez-Castro.  It does not raise any substantial additional claims.

-7-

certainty is a rubric that calls for proof verging on actual knowledge."  Id.  By contrast, under the Pinkerton theory of liability, the jury must find that the defendant was a member of a conspiracy and the use or carrying of a firearm was "reasonably foreseeable" in furtherance of the conspiracy.  Shea, 150 F.3d at 50.

Notwithstanding this difference, "a jury may be instructed to consider the liability theory established in Pinkerton as an alternative ground for conviction under § 924(c)(1) in addition to an aiding and abetting theory."  United States v. Medina-Roman, 376 F.3d 1, 3 n.4 (1st Cir. 2004) (internal citation omitted).  The alternative instruction is justified because, "[a]s with the aiding and abetting theory, vicarious co-conspirator liability under Pinkerton is not in the nature of a separate offense."  United States v. Sanchez, 917 F.2d 607, 612 (1st Cir. 1990) (internal quotations omitted); accord United States v. Gobbi, 471 F.3d 302, 309 (1st Cir. 2006) ("The law is crystalline that, when the government has advanced several alternate theories of guilt and the trial court has submitted the case to the jury on that basis, an ensuing conviction may stand as long as the evidence suffices to support any one of the submitted theories.").

In the same manner, the trial court may instruct the jury on a Pinkerton theory even though the indictment does not plead vicarious liability.  Sanchez, 917 F.2d at 612.  "Indeed, every

court to consider the matter has held that the individual substantive counts need not make reference to co-conspirator liability in order for the jury to be so instructed." Id. (internal quotations omitted).

When an indictment does not reference Pinkerton liability, however, the defendant remains entitled to fair notice of the government's charge against him. Id. at 611. The defendants in Sanchez were charged with conspiracy and possession of cocaine for distribution, and the district court instructed the jury on both aiding and abetting and Pinkerton theories of liability. Id. at 611-12. Even though the indictment itself did not mention either theory of liability, we held that the defendants were "on notice of the essential nature of the charges against them." Id. at 612. This is because aiding and abetting "is not a separate offense." Id. at 611-12. Rather, "[a]iding and abetting is an alternative charge in every count, whether explicit or implicit."[2] Id. at 611 (internal citations omitted). We held the Pinkerton charge warranted "on the same reasoning." Id. at 612. There was also no unfair surprise because the government submitted proposed jury instructions on both theories prior to trial. Id.

---

[2] We noted in Sanchez that it is "better practice," however, "to have the indictment framed in the alternative or at least to have noted upon it a reference to" the aiding and abetting theory of liability. Id. at 611 n.3.

-9-

However, "a Pinkerton charge should not be given as a matter of course." Id. at 612 n.4 (internal quotations omitted). The Pinkerton charge causes concern "particularly where the jury is being asked to make the converse inference; that is, to infer, on the basis of a series of disparate criminal acts, that a conspiracy existed." Id. In Sanchez, "there was ample evidence that [the defendant] was a member of the alleged conspiracy to possess cocaine for distribution." The jury instructions on aiding and abetting and Pinkerton were proper for the separate purpose of determining whether the defendant's co-conspirators "committed the substantive offense of possessing cocaine for distribution." Id.

Applying this reasoning, the district court here did not plainly err by instructing the jury on the Pinkerton theory of liability as an alternative to the aiding and abetting theory. Even though only the aiding and abetting theory was specifically referenced in the indictment, each theory was implicit in the firearm charge against him. See id. at 611-12. "Since there was sufficient evidence to enable a jury to conclude, beyond a reasonable doubt," that Vazquez-Castro and his co-defendants were members of the cocaine conspiracy, "the Pinkerton charge was proper" on the substantive weapon count. See id. at 612.

There was also no unfair surprise. As the district court pointed out, the parties argued the Pinkerton element of foreseeability during trial. See Gobbi, 471 F.3d at 309; cf.

-10-

Medina-Roman, 376 F.3d at 3 n.4. Additionally, Vazquez-Castro's own proposed jury instructions referenced the Pinkerton theory of liability. See Sanchez, 917 F.2d at 612. Moreover, following a charge conference in chambers and prior to instructing the jury, Vazquez-Castro appears to have agreed on the record to the Government's request that the court include the Pinkerton instruction.

## B. Sufficiency of the Evidence

To convict a defendant under § 924(c)(1)(A), the government must prove that the defendant (1) committed a drug trafficking crime; (2) knowingly possessed a firearm; and (3) possessed the firearm in furtherance of the drug trafficking crime. United States v. Pena, 586 F.3d 105, 112 (1st Cir. 2009). "We have repeatedly held that under Pinkerton, the defendant does not need to have carried the gun himself to be liable under § 924(c)." United States v. Flecha-Maldonado, 373 F.3d 170, 179 (1st Cir. 2004). "So long as there is sufficient evidence that a co-conspirator carried or used a firearm in furtherance of the conspiracy and that this was reasonably foreseeable to the defendant, the defendant can be held liable as if he himself carried or used the firearm." Id.

It is not necessary to show that the defendant owned or "physically possessed" the firearm, and possession may be constructive. United States v. Rodriguez-Lozada, 558 F.3d 29, 41

(1st Cir. 2009).  "Constructive possession of a firearm may be established by showing that the person knows (or has reason to know) that the firearm is within easy reach, so that he can take actual possession of it virtually at will."  United States v. Robinson, 473 F.3d 387, 399 (1st Cir. 2007).  "The mere presence of a firearm" in the area is insufficient, and there must be some "nexus" between the firearm and the offense.  Id. at 400.  In determining whether there is a nexus, we consider whether the firearm was loaded, whether the firearm was easily accessible, the proximity of the firearm to the drugs, and the surrounding circumstances.  Id.

"[F]irearms are often used by drug dealers to protect drug stockpiles, to preempt encroachment into a dealer's 'territory' by rival dealers, and for retaliation."  United States v. Luciano, 329 F.3d 1, 6 (1st Cir. 2003).  In Luciano, agents searched an apartment the defendant had been inside just prior to selling heroin.  Id. at 3.  In a crawl space in the ceiling, an agent found a large bag of heroin close to another bag containing two handguns and two loaded magazines.  Id. at 3-4.  The defendant argued there was no nexus between the drug transaction and the gun possession.  Id. at 6.  However, "[g]iven the close proximity of the firearms and loaded magazines to the significant stockpile of heroin, we [had] no difficulty concluding that there was a sufficient nexus

between the drug trafficking crime and the firearms to sustain a conviction under § 924." Id. at 6.

Viewing the evidence in the light most favorable to the jury's verdict in Vazquez-Castro's case, there was sufficient evidence for the jury to convict him of the weapon charge. First, sufficient evidence showed Vazquez-Castro voluntarily and knowingly participated in the drug conspiracy. See United States v. Bristol-Martir, 570 F.3d 29, 39 (1st Cir. 2009). The DEA agents' testimony, video recordings, and Vazquez-Castro's post-arrest interview allowed the jury to reasonably infer that he was aware of, and intended to participate in, the conspiracy. See United States v. Paret-Ruiz, 567 F.3d 1, 6 (1st Cir. 2009) ("An agreement between coconspirators may be proven by circumstantial evidence, and it may be tacit.").

Second, sufficient evidence supports a finding that one of Vazquez-Castro's co-conspirators constructively possessed a firearm "in furtherance of" the drug trafficking crime. Robinson, 473 F.3d at 399. At the time of the arrests, the driver of the Isuzu told the agents where to find the weapon. The pistol was found loaded with a magazine and easily accessible by reaching to the floorboard of the driver's seat in the Isuzu. See Marin, 523 F.3d at 28. Five kilograms of cocaine were found on the floor behind the driver's seat, in close proximity to the gun. See Luciano, 329 F.3d at 6. Additionally, these items were seized in the broader

context of a drug deal, and the driver and passengers arrived at the designated location carrying both the drugs and the gun in their vehicle. See Robinson, 473 F.3d at 400.

Sufficient evidence also supports a finding that it was "reasonably foreseeable" to Vazquez-Castro that a co-conspirator would possess a firearm in furtherance of the conspiracy. Flecha-Maldonado, 373 F.3d at 179. In the days prior to the drug deal, one of Vazquez-Castro's co-conspirators told an undercover agent he carried "steel." Although Vazquez-Castro arrived in a different vehicle on the day of the deal, he walked to and sat inside the Isuzu for several minutes after Angel instructed him to "go get that." While seated in the Isuzu, Vazquez-Castro was within reaching distance of both the loaded weapon and a significant amount of cocaine. When Vazquez-Castro exited the Isuzu, he carried a kilogram of the cocaine back to the Mitsubishi. The Government estimated the total value of the cocaine seized at approximately $100,000. See United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991) ("[W]e think it fairly inferable that a codefendant's possession of a dangerous weapon is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash.").

Under these circumstances, the jury could have concluded it was reasonably foreseeable to Vazquez-Castro that one of his

co-conspirators would carry a firearm.  <u>See</u> <u>United States</u> v. <u>Bucci</u>, 525 F.3d 116, 132 (1st Cir. 2008); <u>Flecha-Maldonado</u>, 373 F.3d at 179; <u>Bianco</u>, 922 F.2d at 912.  The jury's finding of liability on a <u>Pinkerton</u> theory is sufficient to uphold Vazquez-Castro's conviction on the gun charge, and we therefore need not reach the question of whether this evidence adequately supported the higher showing required under an aiding and abetting theory of liability.

**AFFIRMED.**